IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

ACCIONA WINDPOWER NORTH
AMERICA, LLC,

   **Plaintiff,**

vs.

CITY OF WEST BRANCH,

   **Defendant.**

No. C14-0033

**RULING ON MOTIONS FOR
SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

*I.*   *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*II.*   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*III.*   *RELEVANT FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.*  *The Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B.*  *The Parties' Performance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     *1.*  *Acciona* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     *2.*  *City of West Branch* . . . . . . . . . . . . . . . . . . . . . . . . . 8

*IV.*   *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
   *A.*  *Did Acciona Perform its Obligations Under the Agreement?* . . . . . 11
   *B.*  *Did West Branch Perform its Obligations Under the Agreement?* . . 16
   *C.*  *Has Acciona Suffered Damages?* . . . . . . . . . . . . . . . . . . . . . 21
   *D.*  *What About a Rebate which was "Obligated for Appropriation" but
     not Paid?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   *E.*  *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*V.*   *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# I. INTRODUCTION

On the 4th day of August, 2015, this matter came on for hearing on the Motion for Partial Summary Judgment (docket number 37) filed by Plaintiff Acciona Windpower North America, LLC ("Acciona") on June 15, 2015, and the Motion for Summary Judgment (docket number 38) filed by Defendant City of West Branch ("the City" or "West Branch") on the same day. Acciona was represented by its attorneys, Theresa C. Davis and Dana L. Oxley. West Branch was represented by its attorneys, William J. Miller and Brian A. Melhus.

## II. PROCEDURAL HISTORY

On March 7, 2014, Acciona filed a complaint seeking damages for the City's alleged breach of contract, and seeking specific performance. After its motion to dismiss (asserting a lack of subject matter jurisdiction) was denied, West Branch filed an answer on June 10, 2014.

On July 7, 2014, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. Also at that time, the case was referred to me for the conduct of all further proceedings and the entry of judgment, in accordance with 28 U.S.C. § 636(c) and the consent of the parties. After consulting with counsel, this matter was set for a non-jury trial beginning on October 19, 2015.

## III. RELEVANT FACTS

### A. The Agreement

In January 2008, Acciona and the City executed an Amended Tax Increment Development Agreement ("the Agreement"). The Agreement stated that Acciona "intends to expand its business and to thereby generate employment opportunities within West Branch's Urban Renewal Area." Specifically, with the City's assistance in the form of tax rebates, Acciona intended to undertake an urban renewal project which would create a substantial number of new jobs in West Branch.

Under the terms of the proposal, ACCIONA will undertake the Project consisting of certain improvements as set forth in Section II (hereinafter "Minimum Improvements") to be completed in the Project Area by ACCIONA, and will create approximately 110 new full-time jobs in a period of not to exceed five (5) years commencing May, 2007, if the City will agree to assist the Project by rebating to ACCIONA, for a period of eight years, incremental property taxes actually paid with respect to the Minimum Improvements and received under Iowa Code Section 403.19 by the City (hereinafter "City Contribution"), Code of Iowa.

Amended Tax Increment Development Agreement at 1 (Plaintiff's App. 2).

According to the Agreement, the City determined that "the Project is consistent with the objectives of the Plan for the Urban Renewal Area and that development of the Project Area and the Urban Renewal Area by construction of the Minimum Improvements is in the vital and best interests of the City." Accordingly, the City found that "the use of City funds to finance the City Contribution is in accord with the provisions of the applicable laws under which the Project will be undertaken, including, but not limited to, Iowa Code chapter 403."

Acciona agreed that it "will cause the Minimum Improvements to be constructed in the Project Area" in accordance with the terms of the Agreement. Among other things, the Minimum Improvements required a capital investment of at least $11 million, "[t]he creation of approximately 110 new, full-time jobs within a period of not to exceed five (5) years," and the payment of a median wage for new non-management production jobs of at least $14.57 per hour. The Agreement required that "[t]he Minimum Improvements shall be completed within a five-year period beginning May, 2007." *See* Plaintiff's App. 3.

In consideration of the Minimum Improvements pledged by Acciona, the City agreed "to assist in the Project by rebating to ACCIONA, or its successor in interest with written consent of the City, that percentage of incremental taxes actually paid with respect

to the Minimum Improvements and received under Iowa Code Chapter 403.19 by the City, as set forth in the attached Exhibit B, for a period of eight years beginning with the tax year in which property taxes on the completed value of the Minimum Improvements are first paid."[1] The Agreement further provided:

> The rebate shall not constitute general obligations of the City, but shall be paid solely from the incremental property taxes received by the City from the Cedar County Treasurer that are attributable to the Property.
>
> Each rebate payment shall be subject to annual appropriation of the City Council. Prior to December 1st of each year during the term of this agreement, beginning December 1, 2007, the City Council shall consider the issue of obligating for appropriation to the funding of the payments due in the following fiscal year, an amount of tax increment revenues to be collected in the following fiscal year.
>
> To effectuate this commitment, the City agrees to annually certify under Section 403.19 to the Cedar County Auditor no later than December 1 of each year the amount of taxes to be paid over to the City and the amount obligated for appropriation for rebate to Acciona in accordance with Exhibit B. If the City fails to certify and make the annual appropriation as set out above, no rebate shall be paid for said year and the remaining rebate schedule shall be extended by one year so as to allow eight full years of rebates under this Agreement.

Amended Tax Increment Development Agreement, Section II (Plaintiff's App. 4).

---

[1] Exhibit B to the Agreement establishes various percentages to be rebated during the eight years provided in the Agreement, ranging from 94% to 65%. *See* Plaintiff's App. 8.

4

## B. The Parties' Performance

### 1. Acciona

Steven Cieslak, Director of Finance for Acciona, states in a supporting affidavit that Acciona "completed construction of its facility in March 2009, having spent in excess of $20,000,000 on the building remodeling and on new machinery and equipment for the expanded facility."[2] Cieslak further avers that Acciona had created 158 new jobs as of May 2008, and by May 2009 had created 188 jobs. According to Cieslak, Acciona had 123 jobs in May 2010, and 115 jobs in May 2011. Acciona underwent a "reduction in force" in March 2012, however, reducing the number of full-time employee positions to 102. According to Cieslak's first affidavit, Acciona had 102 jobs in May 2012 (the deadline established in the Agreement).[3]

In its resistance, West Branch cites the deposition testimony of Joe Baker, who the City identifies as Acciona's former chief executive officer. In response to questioning by the City's attorney, Baker agreed with Cieslak's letter to the city administrator dated May 9, 2013, stating that Acciona had 102 employees as of May 2012.[4] Baker was then asked "[w]ould you have any idea of where those employees were located specifically?" Baker initially answered: "No, not off the top of my head."[5] Baker then testified that 60 or 70%

---

[2] Affidavit of Steven Cieslak at 1, ¶ 1 (Plaintiff's App. 37).

[3] *Id.* at 1-2, ¶¶ 2-6 (Plaintiff's App. 37-38).

[4] Letter from Steven Cieslak to Matt Muckler, dated May 9, 2013 (Plaintiff's App. 39-40 and 75-76).

[5] Deposition of Joe Baker, 33:9 (Defendant's App. 73).

of Acciona's total employment "typically were located physically in West Branch."[6] According to Baker, "that's my memory."[7]

In a later affidavit, Cieslak clarified that the employment numbers cited in his first affidavit included employees performing jobs not based in West Branch. Acciona manufactures wind turbines at its plant in West Branch. Acciona also installs, services, and manages wind turbines at its customers' locations throughout the country. Accordingly, Acciona has employees who are not based in West Branch, employees who work at the West Branch facility, and "field employees" who perform jobs at the West Branch facility when there are no projects to manage in the field. According to Cieslak, the jobs described as "'based in West Branch if not at project' were filled by individuals who maintained residences in the West Branch area and who also perform jobs at the West Branch facility when they were not working on a project at a customer's location, what we refer to as being out in the field."[8] In its supplemental appendix, Acciona produced detailed payroll records for its employees during the relevant time period. In his second affidavit, Cieslak provides a table showing the number of employees in each category:

---

[6] *Id.*, 33:10-13 (Defendant's App. 73).

[7] *Id.*, 33:23 (Defendant's App. 73).

[8] Affidavit of Steven Cieslak at 3, ¶ 7 (Plaintiff's Supp. App. 93).

|                                   | 5/12/2012 | 5/28/2011 | 5/15/2010 | 5/30/2009 | 5/31/2008 |
|-----------------------------------|-----------|-----------|-----------|-----------|-----------|
| Not based in WB                   | 9         | 13        | 18        | 20        | 21        |
| Permanent in WB                   | 76        | 84        | 85        | 139       | 119       |
| Based in WB if not at project     | 16        | 14        | 22        | 29        | 27        |
| Total                             | 101       | 111       | 125       | 188       | 158       |
| Permanent in WB or Based in WB if not at project in field | 92 | 98 | 107 | 168 | 146 |

Affidavit of Steven Cieslak at 2-3, ¶ 5 (Plaintiff's Supp. App. 92-93).

## 2. *City of West Branch*

Initially, the City rebated a percentage of the incremental property taxes pursuant to the terms of the Agreement. The City paid Acciona $144,225 in fiscal year 2010, $186,899 in fiscal year 2011, and $113,077 in fiscal year 2012.[9]

On November 5, 2012, the City passed a resolution obligating a rebate to Acciona in the amount of $265,140, representing a percentage of incremental taxes paid by Acciona for fiscal year 2012, to be paid in the fiscal year beginning July 1, 2013 (FY 2014). According to the resolution, "[t]he City Council obligates $302,527[10] for appropriation

---

[9] Affidavit of Steven Cieslak at 2, ¶ 7 (Plaintiff's App. 38). (It would appear that there may be some confusion regarding the numbering of the "fiscal years." I believe the payments referred to by Cieslak were probably paid during the fiscal years *beginning* on July 1, 2010, 2011, and 2012. These would commonly be referred to as fiscal years 2011, 2012, and 2013. In Resolution No. 1045, for example, the Resolution is entitled "A Resolution Obligating Funds from the Urban Renewal Tax Revenue Fund for the Payment of Annual Appropriation Tax Increment Financed Obligations in Fiscal Year 2014," but the language of the Resolution refers to an obligation for appropriation for payment "in the fiscal year beginning July 1, 2013." *See* Plaintiff's App. 59.)

[10] The amount to be paid to Acciona was $265,140. The remaining $37,387 related
(continued...)

from the Urban Renewal Tax Fund to the Annual Payment in the fiscal year beginning July 1, 2013."[11] However, the City did not pay the money obligated for appropriation, as described in the resolution.

Instead, on April 16, 2013, the West Branch city administrator, Matt Muckler, sent a letter to Acciona, entitled "NOTICE OF INTENT TO CANCEL AGREEMENT."[12] In the letter, Muckler asserts that "[w]ith the recent layoffs, Acciona has failed to maintain its 110 jobs and continued payment of a median wage for 95 employees, all as required by Section I of said Agreement."[13] Citing Section III of the Agreement, Muckler advises Acciona that "[i]n the event that Acciona fails to bring the employment level up to the required levels by Friday, May 17, 2013, the City Council intends to cancel this Agreement because of Acciona's breach of the Agreement."[14]

---

[10](...continued)
to a Water Tower Project, and has no part in this dispute.

[11] Resolution No. 1045 (Plaintiff's App. 59).

[12] According to the minutes of the West Branch City Council meeting on April 15, 2013, the letter giving Acciona "notice of intent to cancel agreement" was intended "to start a discussion with Acciona on their future business plans." (Plaintiff's App. 73.)

[13] Letter from Matt Muckler to Joe Baker, dated April 16, 2013 (Plaintiff's App. 68).

[14] Section III of the Agreement provides, in part, as follows:

> If ACCIONA breaches any term of this Agreement and said breach is not cured within thirty (30) days after written notice, the City shall have the right to cancel this Agreement, suspend performance, take any legal or administrative action deemed appropriate to obtain a refund of its consideration paid under Section II, and to recover damages under this Agreement, all costs of collection, including reasonable attorney fees, or seek any combination of these remedies.

(continued...)

Steven Cieslak responded to Muckler in a letter dated May 9, 2013, denying that Acciona had failed to meet the Minimum Improvements requirement for job creation. According to Cieslak's letter, "[a]s of May 2012, Acciona employed 102 employees, which while not 110 employees, is 'approximately 110' employees, consistent with our obligations under the Development Agreement."[15] The letter states that "[w]e consider our obligations under the Development Agreement to be satisfied and expect the City to comply with its obligations thereunder."[16] The letter invited Muckler to call "if you have any questions or would like to discuss."[17] When the City persisted in its refusal to pay any further rebate, Acciona filed the instant action.

## IV. DISCUSSION

Both parties claim they are entitled to summary judgment. Acciona argues that "[t]his is a straight forward breach of contract action." According to Acciona, the parties reached an agreement and Acciona performed its duties pursuant to the Agreement; but the City failed to rebate a percentage of the incremental property taxes as required by the Agreement and instead wrongfully cancelled the Agreement. Conversely, West Branch argues that Acciona failed to meet its obligations under the Agreement, and the City was authorized to cancel the Agreement pursuant to its terms. Alternatively, the City argues that it cannot be forced to appropriate rebates to Acciona in any given year, and that any

---

[14](...continued)

Amended Tax Increment Development Agreement, Section III (Plaintiff's App. 4).

[15] Letter from Steven Cieslak to Matt Muckler, dated May 9, 2013 (Plaintiff's App. 39-40).

[16] *Id.*

[17] At its May 20, 2013, meeting, West Branch City Attorney Kevin Olson inaccurately reported to the City Council that "there has been a lack of communication from Acciona and that the company confirmed that they did not meet their obligations under the Agreement." (Plaintiff's App. 79).

agreement purporting to "contract away" the City's legislative authority is invalid and unenforceable.

In order to recover on its claim for breach of contract, it is necessary for Acciona to show: (1) the existence of the contract, (2) the terms and conditions of the contract, (3) that Acciona has performed all the terms and conditions required under the contract, (4) the City breached the contract by failing to perform, and (5) that Acciona suffered damages. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). It is undisputed the parties executed a written agreement which sets forth its "terms and conditions." Accordingly, it is necessary for Acciona to prove it performed its obligations under the Agreement, West Branch failed to perform, and Acciona suffered damages.

### A. Did Acciona Perform its Obligations Under the Agreement?

In Section I, paragraph 1 of the Agreement, Acciona agreed to undertake certain "Minimum Improvements," as identified in subparagraphs a-g. Among other things, Acciona agreed the Minimum Improvements would include "[t]he creation of approximately 110 new, full-time jobs within a period of not to exceed five (5) years," and the "[p]ayment of a median wage for the 95 new, full-time, hourly non-management production jobs of at least $14.67 per hour."[18] The City claims Acciona failed to comply with these two requirements.[19]

In the City's letter to Acciona dated April 16, 2013 — notifying Acciona of the City's intent to cancel the Agreement — the City administrator asserted that "[w]ith the recent layoffs, Acciona has failed to maintain its 110 jobs and continued payment of a

---

[18] Agreement, Section I, paragraph 1(c and d) (Plaintiff's App. 3).

[19] At the hearing, the City's counsel conceded Acciona complied with the other five requirements.

median wage for 95 employees, all as required by Section 1 of said Agreement."[20]  In
Acciona's response dated May 9, 2013, Steven Cieslak asserted that "[a]s of May 2012,
Acciona employed 102 employees, which while not 110 employees, is 'approximately 110'
employees, consistent with our obligations under the Development Agreement."[21]  Cieslak
did not respond to the City's allegations regarding the "continued payment of a median
wage."

According to Steven Cieslak's second affidavit, as illustrated in the table on page 7,
Acciona complied almost immediately after the Agreement was executed with the
requirement that it create approximately 110 new full-time jobs.  By May 31, 2008,
Acciona employed 119 workers in West Branch.  If employees working in the field (but
who were "based" in West Branch) are included, then the number of total employees
increases to 146.  The number of employees increased the following year.  On May 30,
2009, Acciona had 139 employees in West Branch, and an additional 29 "field
employees," for a total of 168 employees.  By May 15, 2010, however, the number of
employees in West Branch had dropped to 85, with a total of 107 employees if field
employees are included.  It should be recalled that the City paid Acciona a tax rebate in
fiscal years 2011, 2012, and 2013, apparently representing the first three years set forth
in the table.

The number of Acciona's employees continued to drop.  According to Cieslak, by
May 28, 2011, there were 84 permanent employees in West Branch, with an additional
14 based in West Branch if not working in the field.  That is, the number of Acciona

---

[20] During his recent deposition testimony, West Branch Mayor Mark Worrell
testified that the intent of the letter was "to get them to the table to talk to us."  Worrell
conceded that the City Council had "no clue" as to the number of jobs at Acciona at that
time.  Deposition of Mark Worrell, 45:24-46:1 (Plaintiff's App. 15-16).

[21] Letter from Steven Cieslak to Matt Muckler, dated May 9, 2013 (Plaintiff's
App. 39-40 and 75-76).

employees having some connection with West Branch had dropped to 98 on May 28, 2011. By May 12, 2012, the number of similarly situated employees had dropped to 92.

One of the fighting issues is whether Acciona was merely required to create approximately 110 new full-time jobs within five years — the language employed in the Agreement — or whether it was required to create *and maintain* that number of jobs, as asserted by West Branch. Acciona argues that the unambiguous contract terms must be strictly enforced. While it is undisputed that Acciona created more than 110 new full-time jobs, the City argues that its "course of dealing" with Acciona is evidence that "the relevant time period for measuring the number of jobs created required by the Agreement was May 2012."[22] That is, rather than *creating* 110 jobs *within* five years, the City would require Acciona to *maintain* 110 jobs at the *end* of five years.

A resolution of this issue requires the Court to interpret Acciona's obligation for "[t]he creation of approximately 110 new, full-time jobs within a period of not to exceed five (5) years." "The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract." *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008). "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." *Id.* (quoting *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999)). However, "[t]hese rules of interpretation are general in character and only serve as guides in the process of interpretation." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS, § 202 cmt. a (1979)).

The City apparently does not argue that Acciona was required to immediately create at least 110 new jobs and then maintain those jobs for the entire five years. Instead, West Branch argues that the target date "for measuring the number of jobs created" was May

---

[22] West Branch's Brief in Resistance (docket number 40) at 11.

2012 (five years after the Agreement was reached).[23] In other words, if Acciona had slowly increased the number of jobs over the first five years and peaked at 110 in May 2012, the City would apparently concede that Acciona had complied with the Agreement by creating approximately 110 jobs within five years. Paradoxically, however, the City asserts that because Acciona immediately exceeded its target of 110 jobs, but the number of jobs fell below 110 prior to May 2012, Acciona failed to comply. I disagree.

Such an interpretation would ignore the plain language of the Agreement. The purpose of the Agreement was to incentivize Acciona to locate in West Branch. To provide a tax incentive, however, the City wanted to make sure a significant number of jobs would be created. The language employed by the parties in the Agreement clearly requires Acciona to *create* approximately 110 new jobs *within* five years. It is undisputed that Acciona complied with that requirement. In fact, it complied almost immediately. Nothing in the Agreement required Acciona to maintain a certain number of jobs over any particular length of time, and it certainly did not require Acciona to have 110 jobs in place in May 2012.[24]

The City's argument that the Agreement was modified "by Plaintiff's own course of dealing with the City" is without merit. In support of its "course of dealing" argument, West Branch points to the letter from Acciona to the City on May 9, where Cieslak responded to the City's cancellation letter and asserted Acciona employed 102 employees in May 2012, which was approximately 110 employees "consistent with our obligations

---

[23] *Id.*

[24] One can hypothesize whether Acciona would have complied with the Agreement if it had hit the job target in the first year and then went out of business in the second year. But we need not do so here, because that is not the case. Acciona substantially exceeded the target in the first and second years and had "approximately 110" (107) jobs in the third year, although in the fourth and fifth years the numbers dropped to 98 and 92, respectively.

under the Development Agreement."[25] Cieslak's solitary letter in response to the City's notice of intent to cancel the Agreement does not constitute a "course of dealing" establishing the terms of the Agreement. *Dunn v. General Equities of Iowa, Ltd.*, 319 N.W.2d 515, 516 (Iowa 1982) ("A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.").

Similarly, the Court rejects the City's argument that the testimony of Plaintiff's expert establishes an obligation by Acciona to create and maintain a certain number of jobs. When asked to explain his understanding of the respective obligations of each party to the Agreement, Mr. Swartzendruber opined that "Acciona was required to create and maintain a certain number of jobs. . . ."[26] The Court serves as its own expert regarding interpretation of a contract.

Turning to the second "Minimum Improvement," in its letter to Acciona in April 2013, the City asserted, without any evidence, that Acciona had failed to pay "a median wage for 95 employees." The City renewed that assertion at the hearing on the motions for summary judgment. Acciona provided detailed payroll records, however, and the City has not responded with any evidence to support its allegation that Acciona failed to meet the wage requirement found in the Minimum Improvements.

Even viewing the evidence in the light most favorable to the City, the Court finds that Acciona performed the Minimum Improvements found in the Agreement. Acciona created substantially more than 110 jobs within five years as required by Section I,

---

[25] Letter from Steven Cieslak to Matt Muckler, dated May 9, 2013 (Plaintiff's App. 39-40 and 75-76).

[26] Deposition of Greg Swartzendruber, 24:20-25:10 (Defendant's App. 062).

paragraph 1(c) of the Agreement.[27]  Similarly, the Court concludes that Acciona met the wage requirement found in Section I, paragraph 1(d).  In short, Acciona complied with the Agreement.

### B. Did West Branch Perform its Obligations Under the Agreement?

West Branch argues that even *if* Acciona met all of its obligations under the Agreement, the City cannot be forced to appropriate money to fund a tax rebate to Acciona.  Pursuant to the Agreement, "[e]ach rebate payment shall be subject to annual appropriation of the City Council."[28]  The City Council must "consider the issue of obligating for appropriation to the funding of the payments" by December 1 of each year.[29]  If no rebate is paid in a particular year, then the rebate schedule is extended by one year "so as to allow eight full years of rebates under this Agreement."[30]

Because the payment of a tax rebate is contingent upon an annual appropriation by the City Council, West Branch argues that it is not required to pay Acciona a tax rebate in any given year.  Instead, the Agreement only requires that it "consider" such an appropriation.  In support of its argument, the City cites *Fults v. City of Coralville*, 666 N.W.2d 548 (Iowa 2003).  In that case, the issue was whether Coralville exceeded the constitutional debt limit placed on municipalities by issuing $20 million in notes and $13 million in bonds.  "The notes and bonds were contingent obligations subject to repayment only if the city would annually appropriate the funds necessary for repayment." *Id.* at 551.  The City argued that because the repayment obligation was conditioned on yearly

---

[27] Because the Court has concluded that Acciona was not required to *maintain* approximately 110 jobs at the *end* of the five-year period, it is not necessary for the Court to determine whether 92 or 98 is "approximately 110."

[28] Amended Tax Increment Development Agreement, Section II, paragraph 1 (Plaintiff's App. 4).

[29] *Id.*

[30] *Id.*, Section II, paragraph 2.

appropriations, it was not a legally cognizable debt, and was not subject to the constitutional debt limitation. *Id.* at 555-56. The Iowa Supreme Court agreed.

The *Fults* Court first noted that "[t]he Iowa Constitution imposes a limitation on the amount of debt a political subdivision may create to 'prevent the general taxes of a political subdivision from becoming overburdened by obligations.'" *Id.* at 556. However, "[i]f there is no legally enforceable obligation to continue repayments in the future, such 'debt' is not considered constitutional debt." *Id.*

> [I]f the fact of indebtedness depends upon some act of the city, or upon its volition to be exercised or determined at some future day, then no present indebtedness is incurred, and none will be until the period arrives, and the required act or option is exercised, and from that time only can it be said there exists an indebtedness.

*Fults*, 666 N.W.2d at 557 (quoting *Burlington Water Co. v. Woodward*, 49 Iowa 58, 62 (1878)).

The Court then considered whether the notes and bonds holders could require the City to pay pursuant to the terms of those instruments. The Court concluded that notwithstanding the expectations of the notes and bonds holders that the City would pay pursuant to these instruments, the City had no legal obligation to do so.

> The notes and bonds clearly indicate the only way the city incurs an obligation to repay the money is an affirmative act authorizing an appropriation in *each* fiscal year. There is no language indicating the city "shall pay" the money back. The city's obligation is restricted to the fiscal year within which the city council appropriates money for repayment. At the end of that fiscal year, the city has no obligation or liability under the loan agreement for the notes and bonds. *In other words, the creditors in this case do not have a right to receive and enforce payment.*

*Fults*, 666 N.W.2d at 559 (emphasis added).

In reaching its conclusion, the Iowa Supreme Court noted the "moral" and "practical" reasons why Coralville would want to pay on the notes and bonds. The property owners argued that from a practical standpoint, nonappropriation by the City Council would have a "disastrous result," including Coralville's inability "to borrow money for even essential city services or of having that money at higher interest rates." *Id.* at 558. The Court concluded, however, that "a moral obligation is not in and of itself 'debt,'" and "[e]ven if the practical effect of these agreements is that the city will repay the notes and bonds, this does not affect our analysis as long as the city cannot be held legally responsible for the debt for a year other than one in which funds have been appropriated." *Id.*

Like the notes and bonds in *Fults*, the Agreement in this case does not unconditionally obligate the City to pay a tax rebate to Acciona. Instead, the Agreement provides that "[e]ach rebate payment shall be subject to annual appropriation of the City Council." The Agreement provides that no later than December 1 of each year, "the City Council *shall consider* the issue of obligating for appropriation" funding for a tax rebate. (emphasis added) There are practical reasons why the City would want to pay a tax rebate if Acciona complied with its obligation under the Agreement. If the City elected not to appropriate a tax rebate notwithstanding Acciona's compliance, then it may be difficult to attract another company to the area under a similar agreement. In addition, it can be argued that the City had a "moral" obligation to meet Acciona's expectation that Acciona would receive a tax rebate if Acciona complied with the terms of the Agreement.

The Court concludes, however, that given the language agreed to by the parties in the Agreement, the City has no *legal obligation* to appropriate funds for a tax rebate in any given year, despite moral or practical reasons for doing so. That is, each rebate payment was "subject to annual appropriation" by the City Council. The City was not required to appropriate funds in any given year, it was only required to "consider" the appropriation

of such funds. Accordingly, if the City had considered and rejected the payment of a tax rebate by December 1 each year, then Acciona would have no legal recourse.

In this case, however, West Branch did not simply consider and reject Acciona's claim for a tax rebate each year. Instead, it cancelled the Agreement based on Acciona's alleged breach of contract.[31] At its meeting on May 20, 2013, the West Branch City Council was advised by the city attorney that "there has been a lack of communication from Acciona and that the company confirmed that they did not meet their obligations under their agreement."[32] According to the minutes, Mark Nolte, President of the Iowa City Area Development Group, "detailed some of the market conditions that have challenged the wind industry and confirmed that Acciona has not met the requirements in the TIF agreement." Nolte told the City Council that "he would reach out to Acciona and encourage a representative of the company to contact the City." Nolte also provided the mayor and City Council with a letter stating that Acciona's growth "has been hampered by market forces beyond their control." Nolte stated that he had been "tremendously impressed with how Acciona has worked to keep their people employed as long as they possibly could."[33]

---

[31] In its response to Acciona's request for admissions, the City denies Acciona's request that it admit: "The City of West Branch cancelled the Amended Tax Increment Development Agreement dated January 2, 2008 between the City of West Branch and Acciona Energy North America by passing Resolution No. 1114 on May 20, 2013." *See* Plaintiff's App. 65. In its Brief in Resistance (docket number 40), however, the City admits that "[o]n May 20, 2013, the City of West Branch passed resolution No. 1114 cancelling the Agreement." (docket number 40 at 5) Many of the City's responses to Acciona's statement of undisputed facts are similarly hypertechnical, at best.

[32] City Council Meeting Minutes of May 20, 2013 at 3 (Plaintiff's App. 79).

[33] Letter from Mark Nolte to Mayor Worrell, dated May 20, 2013 (Plaintiff's App. 83).

The City Council voted unanimously to cancel the Agreement.[34] In its resolution cancelling the Agreement, the City states that "pursuant to the Agreement, Acciona was to create 110 jobs at the West Branch facility." The fact is, the Agreement required Acciona to "create *approximately* 110 new full-time jobs." (emphasis added) The resolution also states that "Acciona has admitted in its response to the City that is [*sic*] in fact breached the terms of the Agreement." The fact is, in his letter to the City on May 9, 2013, Cieslak stated that "[a]s of May 2012, Acciona employed 102 employees, which while not 110 employees, is 'approximately 110' employees, *consistent with our obligations under the Development Agreement.*" (emphasis added) That is, Acciona did *not* admit that it had breached the terms of the Agreement, but instead specifically stated that it had performed "consistent with our obligations under the Development Agreement."

Acciona argues that the City's cancellation of the Agreement constitutes an anticipatory breach. In response, the City argues that it had the right to cancel the Agreement as a consequence of Acciona's failure to comply with the terms of the Agreement. Section III, paragraph 1 of the Agreement provides that "[i]f Acciona breaches any term of this Agreement and said breach is not cured within thirty (30) days after written notice, the City shall have the right to cancel this Agreement. . . ."

"A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or part of the contract." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). As set forth above, Acciona performed its obligations under the Agreement. Acciona was required to create approximately 110 new full-time jobs within five years. It did so. Acciona was required to pay a median wage of at least $14.57 per hour. It did so. The City concedes Acciona

---

[34] Resolution No. 1114 (Plaintiff's App. 82).

complied with the other requirements constituting the Minimum Improvements described in the Agreement.

Conversely, the City failed to meet its obligations under the Agreement. The City was required, prior to December 1 of each year, to consider the issue of obligating for appropriation the funding required for a tax rebate to Acciona. Rather than comply with its obligation, however, the City elected to cancel the Agreement without any legal excuse. This constituted an anticipatory breach of the contract. *Lane v. Crescent Beach Lodge & Resort, Inc.*, 199 N.W.2d 78, 82 (Iowa 1972) ("Anticipatory breach requires a definite and unequivocal repudiation of the contract."). The cancellation provision found in Section III of the Agreement does not provide the City with safe harbor, because Acciona had not "breache[d] any term of this Agreement." Accordingly, the Court finds — even viewing the evidence in the light most favorable to West Branch — that Acciona performed its obligations under the Agreement and the City failed to perform, instead breaching the Agreement by cancelling the Agreement without legal excuse. *Molo Oil*, 578 N.W.2d at 224.

### C. Has Acciona Suffered Damages?

To recover on its claim for breach of contract, it is not enough that Acciona prove that it performed its obligations under the contract, while the City breached the contract by failing to perform. In addition, Acciona must show that it suffered damages. *Molo Oil Co.*, 578 N.W. 2d at 224. In its complaint, Acciona seeks compensatory damages (Count I) and specific performance (Count II). Acciona argues that it has been damaged because "[i]t received only three years' worth of tax rebates out of the required eight-year commitment from the City."[35] Acciona asks the Court to order the City to pay a tax rebate for the remaining five years.

---

[35] Acciona's Brief (docket number 37-1) at 15.

20

"Under Iowa law, when a contract has been breached, the nonbreaching party is generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed." *Midland Mut. Life Ins. v. Mercy Clinics*, 579 N.W.2d 823, 831 (Iowa 1998) (cited with approval in *Shelby County Cookers, LLC v. Utility Consultants International, Inc.*, 857 N.W.2d 186, 195 (Iowa 2014)). "Under this theory of damages, the nonbreaching party's recovery 'is limited to the loss he has *actually suffered by reason of the breach*; he is not entitled to be placed in a better position than he would have been in if the contract had not been broken.'" *Id.* (quoting 22 Am. Jur. 2d *Damages* § 45 (1988)) (italics in original). *See also DeWaay v. Muhr*, 160 N.W.2d 454, 459 (Iowa 1968) ("Of course recovery of the injured party is limited to the loss he actually suffers by reason of the breach; he should not be placed in a better position than he would be in if the contract had not been broken.").

Section III of the Agreement provides that if the City breaches the agreement, Acciona "shall have the right to terminate this Agreement or take any legal or administrative action deemed appropriate to recover damages or enforce the City's performance obligations under this Agreement."[36] Acciona's right to sue for damages does not, however, modify Iowa law regarding the measure of damages. If the Court ordered the City to pay a tax rebate for the remaining five years under the Agreement, then Acciona would be placed in a better position than if the contract had not been breached. That is, if the City had not breached the contract by cancelling the Agreement without legal cause, then it is only required to "consider" whether a tax rebate would be paid in any given year. As discussed in detail above, the tax rebate was subject to an annual appropriation by the City Council and, therefore, the City had no legal obligation to pay a rebate absent that approval. Accordingly, to award damages for five years of unpaid tax

---

[36] Plaintiff's App. 4.

rebates (assuming that amount could be calculated),[37] would place Acciona in a better position than if the contract had not been breached by the City.

Under the unique circumstances presented in this case, the Court concludes that Acciona is not entitled to compensatory damages but is, instead, entitled to specific performance of the Agreement. *Midland*, 579 N.W.2d at 831 ("The measure of damages recoverable for a breach of contract in each case must have relation to the nature and purpose of the contract itself, as viewed in connection with the character and extent of the injury."). That is, because Acciona performed its obligations under the Agreement, the City is also required to perform its obligations. This will place Acciona in the same position as it "would have occupied had the contract been performed." *Id.* In this case, that means the City must, prior to December 1st of each year, "consider the issue of obligating for appropriation to the funding of the payments due in the following fiscal year, an amount of tax increment revenues to be collected in the following fiscal year." As set forth above, however, the City has no legal obligation to appropriate funds for a tax rebate in any given year, despite moral or practical reasons for doing so.[38]

---

[37] Acciona claims that based on an estimated $330,000 in property taxes to be paid each year, and based on the rebate schedule attached to the Agreement, the total estimated rebate over an eight-year period would be $2,148,300. *See* Exhibit B attached to the Agreement (Plaintiff's App. 8). However, during the first three years of the Agreement, the City paid only $444,201, substantially less than the $755,700 estimated in Exhibit B. Moreover, West Branch notes that the estimated rebate is based on a property valuation of $11 million, while Acciona recently reached a settlement with the Cedar County Board of Review, placing the value at $8,050,000. *See* "Order Approving Settlement" (Defendant's App. 076).

[38] The City argues that *if* the Agreement is construed to *require* payment of an annual tax rebate by the City, then it is an "invalid and unenforceable attempt to contract away the City's governmental power to appropriate funds." In *Marco Development Corp. v. City of Cedar Falls*, 473 N.W.2d 41, 42 (Iowa 1991), the Court made it clear that "[a] city may not contract for the performance of its governmental, as opposed to its proprietary, functions." There, the Court found that the city was not obligated to perform (continued...)

## D. *What About a Rebate which was "Obligated for Appropriation" but not Paid?*

There remains the issue of whether the City has a legal obligation to pay Acciona $265,140, representing a percentage of incremental taxes paid by Acciona for fiscal year 2012, to be rebated in fiscal year 2014. At its meeting on November 5, 2012, the City Council approved resolution 1045, "obligating funds from the urban renewal tax revenue fund for the payment of annual appropriation tax increment financed obligations."[39] The Resolution is entitled "A Resolution Obligating Funds from the Urban Renewal Tax Revenue Fund for the Payment of Annual Appropriation Tax Increment Financed Obligations in Fiscal Year 2014." It was resolved by the City Council as follows:

---

[38](...continued)
a contract approved by a previous city council.

> A municipal corporation may, by contract, curtail its right to exercise functions of a business or a proprietary nature, but, in the absence of express authority from the legislature, such a corporation cannot surrender or contract away its governmental functions and powers, and any attempt to barter or surrender them is invalid. Accordingly, a municipal corporation cannot, by contract, ordinance, or other means, surrender or curtail its legislative powers and duties, its police power, or its administrative authority.

*Marco*, 473 N.W.2d at 42 (quoting 62 C.J.S. *Municipal Corporations* § 139, at 281-82 (1949)). Stated simply, "[o]ne who contracts with a city is bound at his peril to know the authority of the officers with whom he deals, and a contract unlawful for lack of authority, although entered in good faith, creates no liability on the part of the city to pay for it, even in *quantum meruit*." *Id.* at 43. Because the proposed street widening in *Marco* was a legislative function, "the City was not free to bind itself by contract in the exercise of its legislative functions," and the contract was unenforceable. *Id.*

Because I find the Agreement does not *require* payment of an annual tax rebate by the City, I find it unnecessary to address this issue.

[39] City Council Meeting Minutes, dated November 5, 2012 at 3 (Plaintiff's App. 57).

> Section 1. The City Council obligates $302,527[40] for appropriation from the Urban Renewal Tax Fund to the Annual Payment in the fiscal year beginning July 1, 2013.
>
> Section 2. The City Clerk is hereby directed to certify the amount obligated for appropriation in Section 1 above, on the City's December 1, 2012 certification of debt payable and to reflect such amount in the City's budget for the next succeeding fiscal year.

Resolution No. 1045 (Plaintiff's App. 59). Pursuant to the Resolution, the City Clerk (Matt Muckler) provided the required certification to the County Auditor. *See* Plaintiff's App. 61-64.

The amount "obligated for appropriation" by Resolution No. 1045, and certified by the City Clerk, was never paid. Instead, at its meeting on April 15, 2013, the City Council approved the submission of a letter to Acciona, entitled "Notice of Intent to Cancel Agreement."[41] In his deposition, Muckler testified that there was a discussion to "unappropriate" the funds.[42] According to Muckler, "we got to the County Auditor before the funds were pulled so we never received them."[43] I believe there is a factual dispute regarding what action was taken, if any, to "unappropriate" the obligation authorized by the Council Resolution passed on November 5, 2012. At the hearing, counsel appeared unsure of the procedure required to obligate, appropriate, and then pay the tax rebates, and it is unclear to the Court whether the resolution passed in November 2012 establishes a legal obligation by the City, absent further action by the City. I am

---

[40] Of the total amount, $265,140 was allocated for payment to Acciona.

[41] City Council Meeting Minutes, dated April 15, 2013 at 5 (Plaintiff's App. 73).

[42] Deposition of Matt Muckler, 62:14-18 (Plaintiff's App. 51).

[43] *Id.*, 63:10-12.

unable to award either party summary judgment on this record. Accordingly, the Court finds that this issue should be reserved for trial.

### E. Summary

In summary, the Court finds, after viewing the evidence in the light most favorable to West Branch, that Acciona performed its obligations under the Agreement. That is, Acciona created approximately 110 new, full-time jobs within a five-year period, and paid a median wage in compliance with the terms of the Agreement. I also find that West Branch breached the Agreement by cancelling the Agreement without legal cause. Because the Agreement only required the City to "consider" the payment of a tax rebate in any given year, however, the Court finds that Acciona is not entitled to compensatory damages. Instead, I conclude that Acciona is entitled to specific performance of the Agreement. That is, prior to December 1st of each year, the City must consider the issue of whether Acciona should be rebated a portion of the tax increment revenues.

Regarding the tax rebate which was obligated for appropriation by Resolution No. 1045 in November 2012, I find there are genuine issues of material fact which preclude summary judgment. That issue will be reserved for trial. The parties' respective motions for summary judgment will be granted in part and denied in part, consistent with these findings.

### V. ORDER

It is therefore **ORDERED** that the Motion for Partial Summary Judgment (docket number 37) filed by Acciona and the Motion for Summary Judgment (docket number 38) filed by West Branch are **GRANTED in part** and **DENIED in part** as follows:

1.     Acciona is entitled to specific performance of the Amended Tax Increment Development Agreement executed by the parties in January 2008. The City of West Branch is required to perform its obligations under the Agreement.

25

2.    This matter will come on for trial, as previously scheduled, on the issue of whether the City has a legal obligation to pay Acciona the rebate which was obligated for appropriation in Resolution No. 1045.

DATED this ___4th___ day of September, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA